# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Five Mile Capital Westin North Shore SPE, LLC v. Berkadia Commercial Mortgage, LLC,
2012 IL App (1st) 122812**

---

| | |
|---|---|
| Appellate Court Caption | FIVE MILE CAPITAL WESTIN NORTH SHORE SPE, LLC, Plaintiff-Appellant, v. BERKADIA COMMERCIAL MORTGAGE, LLC; INLAND AMERICAN WHEELING LOAN INVESTMENT, LLC; and U.S. BANK NATIONAL ASSOCIATION, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2812 |
| Filed | December 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an interlocutory appeal from the denial of plaintiff's request to enjoin the sale of a foreclosed property in which it held an interest, and an order quashing the *lis pendens* filed against the property, the appellate court lacked jurisdiction over the quashing of the *lis pendens,* because that order was not appealable under Supreme Court Rule 307(a)(1), but the denial of injunctive relief without an evidentiary hearing was upheld, since plaintiff failed to show that its remedy at law was so insufficient that an injunction was necessary. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-10805; the Hon. Peter A. Flynn, Judge, presiding. |
| Judgment | Affrimed. |

| | |
|---|---|
| Counsel on Appeal | Brian L. Shaw, Terence G. Banich, and Kevin M. Hyde, all of Shaw Fishman Glantz & Towbin LLC, of Chicago, for appellant. |
| | John Robert Weiss, Richard P. Darke, and Elinor L. Hart, all of Duane Morris LLP, of Chicago, for appellee Berkadia Commercial Mortgage, LLC. |
| | William J. McKenna, Jr., and Thomas C. Hardy, both of Foley & Lardner LLP, of Chicago, for appellee Inland American Wheeling Loan Investment, LLC. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. Justices Quinn and Simon concurred in the judgment and opinion. |

## OPINION

¶ 1     Plaintiff Five Mile Capital Westin North Shore SPE, LLC, brought this action seeking, among other things, an injunction against the sale of a multimillion dollar property. The circuit court denied Five Mile's request for a preliminary injunction, and we affirm.

¶ 2     This is a simple case about an investment gone wrong. The Westin North Shore is a hotel located in Wheeling, Illinois, and it is the collateral for an $86 million loan taken out in 2007 by the owner of the building. JPMorgan Chase Bank, N.A., provided the funds for the loan and received a mortgage on the property to secure the note. Shortly after making the loan, however, JPMorgan Chase decided to sell off partial interests in the note to other investors. The plan called for three levels of investment (or "participation," as the formal documents termed it), each with differing amounts of risk. The "Senior A Participant" was the highest level and received the most protection for its investment but the smallest rate of return, and below that was the "Junior B Participant," who received slightly less protection but a better return than the A participant. The lowest level was the "Junior C Participant." This was the riskiest of the three levels, but it also received the highest rate of return out of the three levels. In this case, the Senior A position is held by defendant U.S. Bank National Association as a trustee for other investors who are not involved in this case, and the Junior B position is held by defendant Inland American Wheeling Loan Investment, LLC. Plaintiff holds the Junior C interest, for which it originally paid $24 million.

¶ 3     The trouble started when the property owner defaulted on the loan, apparently sometime in 2010. This was not an unexpected contingency, however, and in this situation the relevant legal documents called for the appointment of a special servicer who would handle the loan servicing and any necessary foreclosure proceedings for the mortgage. The special servicer here is defendant Berkadia Commercial Mortgage, LLC. Although contractually vested with

significant powers over the administration of the loan and the foreclosure, Berkadia has no investment interest in the loan itself. Berkadia initiated foreclosure proceedings in May 2010, and the circuit court entered a judgment of foreclosure and sale in mid-2011. Berkadia then took title to the property at the foreclosure sale on a credit bid.

¶ 4        Under the contract governing the investment (called the "participation agreement"), Berkadia's administration of the mortgage loan, and consequently its decisions regarding the disposition of the property, is subject to several major limitations. First, Berkadia is authorized to take the property at the foreclosure sale solely for the purpose of promptly selling it off and paying out the proceeds to the various participants. The exact amount that each would receive depends on their relative precedence and the amount that the property sells for, but under ideal circumstances each would recoup their original investment plus a portion of the profit from any sale. Second, the agreement contains a "servicing standard," which requires Berkadia to take the best interests of the participants into account in any of its servicing activities, including the disposition of the property. Finally, the agreement grants one of the three participants the status of "controlling participant," which among other things essentially grants that participant the power to veto any of Berkadia's decisions that might adversely affect the investments of the participants. Which of the participants is the controlling participant at the time depends on a complex mechanism that is set forth in detail in the agreement, but the simplest answer is that the identity of the controlling participant depends on the appraised value of the property at a particular point in time.

¶ 5        After the foreclosure sale, Berkadia set about having the property appraised and finding potential buyers, but it quickly found a serious problem. Although the property had been valued at about $110 million in 2007, the value of the property plummeted in the years since the loan was made. Berkadia's appraisers estimated that, as of February 2012, the property was only worth somewhere between $55 million and $61 million. Berkadia received a few bids and managed to find a potential buyer, but the ready buyer offered to purchase the property for only $56.5 million.

¶ 6        This purchase price represented a severe blow to the investors, but it was the worst-case scenario for plaintiff. Recall that plaintiff is the most junior of the three investors and in the riskiest position, meaning that under the participation agreement the interests of the A and B investors must be satisfied before plaintiff, the C investor, can receive anything. At this price, plaintiff's entire $26 million investment would be wiped out, and even Inland (the B investor) would lose about $4 million. Even though the servicing standard required Berkadia to act prudently and to take the best interests of the participants into account in arranging any sale of the property, Berkadia's analysis of the appraisals and current state of the markets led it to believe that the value of the property would not significantly improve by waiting to sell. In fact, Berkadia felt that it might not be able to find *any* future buyers for the property, thus raising the possibility that none of the participants would receive any return on their investment at all. Berkadia decided that it was in the best interests of the A and B investors to sell the property now to a ready buyer rather than to pass on the opportunity in the off chance that both the property would increase in value and another ready buyer would be found at some future date.

¶ 7        Plaintiff was not happy with Berkadia's proposed course of action. In plaintiff's opinion

(backed up by its own analysis and appraisals), the property should actually be valued at about $70 million as of February 2012, and was likely to increase in value over the next few years to about $76 million by 2014. Plaintiff argued that the investors should wait until the property increased in value before selling, or at the very least should not sell to the proposed buyer for only $56 million. Based on plaintiff's analysis, Berkadia was trying to sell the property for at least $15 million less than it should have.

¶ 8        The problem for plaintiff was that it had no say in the process because Inland, not plaintiff, was the controlling participant at the relevant time, at least according to both Inland and Berkadia. Although Inland would likely lose about $4 million in the deal, it agreed with Berkadia's analysis of the situation and decided that it would prefer to minimize its losses on the investment and sell to the ready buyer rather than take the risk of losing more of its investment by waiting for an increase in the property's value that might never happen. Without the status of controlling participant, plaintiff could not prevent Berkadia from going forward with the sale.

¶ 9        And so plaintiff filed this lawsuit, along with a *lis pendens* against the property. In its complaint, plaintiff contended first it, not Inland, is actually the controlling participant, and that it was therefore entitled to direct the disposition and sale of the property. Plaintiff also contended that Berkadia's conduct in the appraisal and sale process violated the servicing standard because it failed to properly take plaintiff's best interests into account. Plaintiff sought damages as well as injunctions stopping the sale and reinstating plaintiff as controlling participant. Defendants moved to dismiss the complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), as well as to lift the *lis pendens* and for permission to proceed with the sale. After extensive briefing and a hearing, the circuit court entered the order that is the subject of this appeal. After carefully considering the nature of the parties' dispute, the circuit court denied the defendants' motion to dismiss the complaint outright and denied the motion to lift the *lis pendens* and authorize the sale, but it did quash the *lis pendens*. The circuit court also treated plaintiff's arguments at the motion hearing as an oral motion for a preliminary injunction against the sale, which it then denied. The circuit court then struck plaintiff's prayers for injunctive relief from the complaint.

¶ 10        Plaintiff has now appealed two aspects of the circuit court's decision: the denial of the preliminary injunction and the quashing of the *lis pendens*. Before reaching the merits, however, we must first consider our own jurisdiction over these issues. See *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 349 (2002). Plaintiff has appealed under Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010), which allows for appeals by right of interlocutory orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." The portion of the circuit court's order denying the motion for a preliminary injunction is therefore properly before us, but the harder question is our jurisdiction over the *lis pendens* issue. A *lis pendens* is not an injunction (see *First Midwest v. Pogge*, 293 Ill. App. 3d 359, 363 (1997)), so we cannot see how an order quashing a *lis pendens* could qualify as refusing an injunction under Rule 307. See also *Oxequip Health Industries, Inc. v. Canalmar, Inc.*, 94 Ill. App. 3d 955, 958 (1981) (noting that a *lis pendens* is a remedy at law, rather than an equitable one).

¶ 11    Plaintiff alternatively argues that the circuit court's act of quashing the *lis pendens* had the same effect as granting an injunction because it restrains plaintiff from informing prospective buyers of the property about the existence of this lawsuit via a *lis pendens*. But accepting that interpretation would stretch the meaning of an injunction beyond all recognition, even though Rule 307(a)(1) is interpreted broadly. See generally *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214 (2000) (discussing jurisdiction under Rule 307(a)(1)). Indeed, if plaintiff's position were taken to its logical extreme, then *any* order granting or denying a motion could arguably be an appealable interlocutory order.

¶ 12    We have been unable to find any cases dealing with this particular issue in the context of a *lis pendens*, but a few cases have analyzed the analogous issue of appellate jurisdiction over orders denying a motion to quash subpoenas. For example, in *Kmoch v. Klein*, 214 Ill. App. 3d 185, 187 (1991), the defendant attempted to appeal the denial of his motion to quash two deposition subpoenas. We found that the order was not an appealable interlocutory order because, although it had some of the qualities of an injunction, orders relating to discovery "were not historically the sole province of courts of equity but were manifestations of the inherent power of all courts to control their own processes." (Internal quotation marks omitted.) *Id.* at 192-93; see also *In re A Minor*, 127 Ill. 2d 247, 261-62 (1989) ("Not every nonfinal order of a court is appealable, even if it compels a party to do or not do a particular thing. Orders of the circuit court which can be properly characterized as 'ministerial,' or 'administrative'–because they regulate only the procedural details of litigation before the court–cannot be the subject of an interlocutory appeal.").

¶ 13    The dispositive question here is whether the power to quash a *lis pendens* is unique to a court sitting in equity or is instead part of the general administrative powers of the circuit court. A *lis pendens* is a creature of statute, but the statute authorizes a party to file a *lis pendens* in only actions that involve a "condemnation proceeding, proceeding to sell real estate of decedent to pay debts, or other action seeking equitable relief, affecting or involving real property." 735 ILCS 5/2-1901 (West 2010). Equitable relief is by definition the traditional domain of courts of equity, which would weigh in favor of finding that orders involving a *lis pendens* are injunctive in nature. But here it is helpful to remember that what is at issue is neither the cause of action itself nor even a *lis pendens*. It is rather an order that quashes a *lis pendens*, which is not an action that belongs solely to courts sitting in equity. Consider for example a simple negligence case involving a car accident, in which, for whatever reason, the plaintiff records a *lis pendens* against the defendant's house. Such an action is inappropriate under the statute, given that the case seeks damages only and not injunctive relief. Yet we can think of no reason why the circuit court would lack the authority to quash the *lis pendens* merely because it was not sitting in equity. As with an order quashing a discovery subpoena, an order quashing a *lis pendens* is simply an administrative order that deals with how the case proceeds before the court, and it can be issued by any court without resorting to its equitable powers. It then follows that, similarly to a discovery order, an order quashing a *lis pendens* is not an interlocutory order that is appealable under Rule 307(a)(1). We accordingly lack jurisdiction over that portion of the circuit court's order.

¶ 14    So the sole issue on appeal is the circuit court's decision to deny plaintiff's request for a preliminary injunction, but first there is an important point about the applicable standard

of review that must be mentioned. The procedural posture of this case is somewhat unusual because the issue of a preliminary injunction originally came before the circuit court in the context of defendants' motion to dismiss under section 2-615 (735 ILCS 5/2-615 (West 2010)). Based on the arguments of the parties in their briefs and during the motion hearing, however, the circuit court realized that the critical issue in the case was whether or not plaintiff could pursue injunctive relief to block the sale. The circuit court recognized that defendants' motion to dismiss under section 2-615 was in substance a motion to strike plaintiff's prayers for injunctive relief under section 2-617 (735 ILCS 5/2-617 (West 2010)). The circuit court also realized that the question of a preliminary injunction would have to be addressed immediately because it would dictate how the rest of the case would unfold, that is, whether the ultimate remedy available in the case would be money damages or a permanent injunction. The circuit court therefore treated the arguments of the parties as a motion for a preliminary injunction by plaintiff and a motion to strike the complaint's prayers for injunctive relief by defendants. The circuit court then denied plaintiff's motion for preliminary injunction and granted defendants' motion to strike the prayers for injunctive relief. The circuit court also denied defendants' remaining motions, including the motion to dismiss under section 2-615.

¶ 15    Although unusual, the circuit court's course of action was proper and was in line with the supreme court's long-standing admonition that motions should be resolved based on their substance rather than their form. See, *e.g.*, *In re Haley D.*, 2011 IL 110886, ¶ 67 ("[W]e have emphasized that the character of the pleading should be determined from its content, not its label. Accordingly, when analyzing a party's request for relief, courts should look to what the pleading contains, not what it is called."). What is important for our purposes is that what the circuit court ultimately did was to deny plaintiff's motion for injunctive relief and to strike the prayer for injunctive relief from the complaint. This is the order that is at issue on appeal rather than an order dismissing a count of the complaint itself under section 2-615, which was the relief that defendants originally sought when they filed their motion. The distinction is critical because it affects the standard of review that we apply on appeal. Dismissal under section 2-615 is reviewed *de novo* (see *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47), but denial of a preliminary injunction is review only for abuse of discretion (see *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365-66 (2001)). We accordingly apply that standard of review to the issues on appeal.[1]

¶ 16    Turning now to the merits, a preliminary injunction is

"an extreme remedy which should be employed only in situations where an emergency exists and serious harm would result if the injunction is not issued. [Citation.] A party seeking a preliminary injunction must establish that (i) a clearly ascertained right in need

---

[1]It should also be noted that neither party objected to the circuit court's procedural handling of this case. In fact, one of the reasons that the circuit court gave on the record for treating plaintiff's arguments as a motion for a preliminary injunction was so that its order could be appealed immediately by either party under Rule 307(a)(1). Indeed, it is doubtful that appellate jurisdiction would even exist at this stage in the case if we were to analyze the circuit court's order as anything but a denial of a motion for a preliminary injunction.

of protection exists, (ii) irreparable harm will occur without the injunction, (iii) there is not an adequate remedy at law for the injury, and (iv) there is a likelihood of success on the merits. [Citations.]

On appeal, a reviewing court examines only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed. The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court, and, on review, the decision will not be disturbed absent abuse of discretion. Stated differently, the only question before the court of review is whether there was a sufficient showing to sustain the order of the trial court. [Citation.]" *Callis*, 195 Ill. 2d at 365-66.

¶ 17    The dispositive factor for the issue of injunctive relief in this case is whether plaintiff's remedy at law is adequate. Plaintiff sought a preliminary injunction that would either prohibit Berkadia from going through with the sale or, failing that, appoint plaintiff as the controlling participant so that plaintiff itself could stop the sale. The end result under either version of the injunction would be the same: the sale does not happen. This means that the adequacy of plaintiff's remedy at law depends on whether plaintiff will suffer irreparable harm if the sale goes forward and plaintiff eventually proves its case against defendants. Plaintiff argues that if the sale is allowed to proceed, then it will be difficult to calculate the proper amount of monetary damages. Plaintiff directs us to similar cases where money damages were prohibitively speculative. See, *e.g.*, *Travelport, LP v. American Airlines, Inc.*, 2011 IL App (1st) 111761 (lost business from online airline-reservation bookings); *Gannett Outdoor of Chicago v. Baise*, 163 Ill. App. 3d 717, 722 (1987) (lost business for outdoor-advertising company). Plaintiff contends that if the property is sold now, then it will be nearly impossible to prove what the property might sell for in the future because the new owner might do something with the property that could drive down the value of the property from what it would have been had the sale never occurred.

¶ 18    All of this is possible, but what plaintiff's position overlooks is that plaintiff itself has provided an idea of what the potential damages would be. Plaintiff's main argument against selling the property now is that Berkadia has undervalued it by about $14 million, which plaintiff bases on its own analysis and appraisals of the property. What makes this significant is that these appraisals form the basis for plaintiff's substantive allegations in the complaint that Berkadia has violated the servicing standard by selling the property too soon and for too little money. If plaintiff can prove these allegations, which at this point in the case we must assume it can, then plaintiff's minimum damages should be whatever its share of profits would be had the property been sold for $14 million more. This is hardly a speculative number.

¶ 19    This situation is distinguishable from *Travelport* and *Gannett Outdoor*, both of which dealt with the loss of potential business income and potential customers. In *Travelport*, the defendant had allegedly barred airline customers from booking tickets through the plaintiff's online service, causing an unknown number of potential customers to use other services instead. See *Travelport*, 2011 IL App (1st) 111761, ¶ 44. We found that the plaintiff's remedy at law was inadequate because it was impossible to determine with any specificity how many customers and how much business would be lost if the injunction were not

granted. The remedy at law was insufficient for the same reasons in *Gannett Outdoor*, which involved an outdoor advertisement that the plaintiff had been barred from displaying. See *Gannett Outdoor*, 163 Ill. App. 3d at 722. Unlike those cases, however, plaintiff's own allegations here demonstrate that any potential damages from a sale can be calculated with a reasonable amount of specificity, making its remedy at law sufficient.

¶ 20    Still, plaintiff does have a point about the difficulty of proving the potential upper limit of its damages. Plaintiff contends that, if the sale is halted and it is named controlling participant, then it would hold the property until sometime in 2014, when the value of the property will theoretically stabilize. What exactly that value might be is hard to determine at present because it is based on a number of assumptions, not least of which is that the property will continue to be used as a Westin hotel, which is an assumption that may change if the property is sold now. But "hard to determine" does not mean impossible. Although plaintiff might face some hurdles in proving its maximum damages in the future, plaintiff already has a basis for estimating its damages through its projections about the value of the property and the state of the market in 2014, not to mention its estimates about the property's current value. Moreover, plaintiff has never explained why these estimates and projections are suitable for proving that Berkadia violated the servicing standard but are unsuitable for proving plaintiff's damages.

¶ 21    What is most important for the purpose of this appeal, however, is the standard of review. The circuit court abuses its discretion only when its ruling "is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). The circuit court heard all of these same arguments and considered them at length, but it ultimately determined that plaintiff had not shown that its remedy at law was inadequate. We cannot say that this was arbitrary or unreasonable, especially given the alleged facts in plaintiff's own complaint regarding Berkadia's violation of the servicing standard during the time leading up to the sale. If plaintiff proves all of these alleged facts, then it should have no trouble proving its damages, and if it cannot prove its allegations, then it has no claim. Either way, plaintiff has not shown that its remedy at law is so insufficient that injunctive relief is necessary.

¶ 22    Plaintiff raises one final issue, arguing that the circuit court erred by not holding an evidentiary hearing. Plaintiff contends that there were disputed issues of fact regarding the "unknown variables" that might affect the future value of the property. "Where the basis for the preliminary injunction rests in the complaint, plaintiff is required to allege, with both certainty and precision, specific facts regarding these elements, including that of irreparable harm. [Citations.] However, an evidentiary hearing on a motion for preliminary injunction is generally required where a verified answer is filed denying material allegations in the complaint. [Citation.]" *Office Electronics, Inc. v. Adell*, 228 Ill. App. 3d 814, 819 (1992); see also *Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B*, 27 Ill. App. 3d 500, 504 (1975) ("The nature of such hearing depends on the status of the pleading, a hearing or legal arguments generally being required on the issue of whether the standards are met for issuance of the order, and an evidentiary hearing required where there is a question of material fact. Thus, such a hearing is not required where no answer is filed."), *aff'd*, 63 Ill.

2d 514 (1976); *Schlicksup Drug Co. v. Schlicksup*, 129 Ill. App. 2d 181, 186-87 (1970) ("Where no answer has been filed, the injunction may be issued based solely on the sufficiency of the complaint, but where an answer has been filed, both the answer and the complaint, must be considered. If the answer contains denials of material allegations of the complaint, a hearing on those matters must be had before the injunction may issue.").

¶ 23 In this case, defendants did not answer the complaint before the motion hearing, so none of the facts alleged in the complaint were yet in dispute. Plaintiff claims that it would have offered evidence regarding the difficulties of getting an adequate comparative appraisal of the property after the sale, but these are hardly contested facts at this point in the case. The circuit court acknowledged that plaintiff might find it difficult to prove its maximum damages, but this observation was based on the uncontested facts as they were alleged in the complaint. An evidentiary hearing would not have added anything to this case or resolved any disputed issue of fact because none existed when the circuit court issued its ruling. The circuit court therefore did not err by ruling on the motion for a preliminary injunction without an evidentiary hearing.

¶ 24 Affirmed.